AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| ALFREDO RODRIQUEZ, DOMINIQUE NICHOLSON, DARNEL REYNOLDS, and WILLIE RILEY, | Case No.  19  MJ03897 |
| Defendants | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about the dates of September 5, 2017 and November 6, 2017, in the county of Los Angeles in the Central District of California, defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 922(a)(1)(A) | Conspiracy and Dealing in Firearms without a License  (Defendants RODRIQUEZ and NICHOLSON) |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm - (Defendants REYNOLDS and RILEY) |

This criminal complaint is based on these facts: *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Tiffany Lamphere, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/17/19

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Patrick J. Walsh, Chief U.S. Magistrate Judge
*Printed name and title*

AUSA:  LUCY B. JENNINGS

## AFFIDAVIT

I, Tiffany Lamphere, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint and arrest warrants against the following individuals:

a.    Alfredo RODRIQUEZ ("RODRIQUEZ") for violations of 18 U.S.C. § 371: Conspiracy and 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms Without a License;

b.    Dominique NICHOLSON ("NICHOLSON") for violations of 18 U.S.C. § 371: Conspiracy and 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms Without a License;

c.    Darnel REYNOLDS ("REYNOLDS"), for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm; and

d.    Willie RILEY ("RILEY") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.     This affidavit is also made in support of an application for a warrant to search the following:

a.    the person of RODRIQUEZ, as described more fully in Attachment A-1;

b.    the person of NICHOLSON, as described more fully in Attachment A-2;

c.    the person of REYNOLDS, as described more fully in Attachment A-3; and

d.    the person of RILEY, as described more fully in Attachment A-4.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 922(g) (Felon in Possession of a Firearm), and 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4 and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrests warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF SA LAMPHERE

5.    I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, as a Special Agent ("SA") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and empowered by law to conduct investigations of and to make

2

arrests for federal felony offenses.  I have been an ATF SA
since January 2015.

6.    I am currently assigned to the Glendale I Field Office
of the Los Angeles Field Division of ATF, which conducts
investigations into violations of federal firearms, explosives,
and narcotics laws.  My experience as an ATF SA includes, but is
not limited to, conducting physical surveillance, executing
search and arrest warrants, and participating in controlled
drug/gun purchase operations using informants.

7.    As part of my training, I attended the Criminal
Investigator and Special Agent Basic Training Academies for ATF
at the Federal Law Enforcement Training Center in Glynco,
Georgia for approximately 26 weeks.  This training included
instruction on federal and state firearms and narcotics laws and
regulations, to which I often refer during the course of my
duties.  In addition, I receive advanced law enforcement
training each year.

8.    I have specialized training and experience in the
investigation of firearms trafficking.  I have participated in
many investigations involving the illegal sales, transfer, and
possession of firearms.  I have also participated in the
interviews of defendants, informants, and witnesses who had
personal knowledge of firearms trafficking methods.
Additionally, I have participated in many aspects of firearms
and gang investigations, including conducting surveillance and
the use of confidential informants ("CI") and undercover agents
to make controlled purchases of narcotics and/or firearms.

9. Prior to my employment with ATF, I was a Border Patrol Agent with Customs and Border Protection in McAllen, Texas from 2013 to 2015. As part of my training, I attended the Border Patrol Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico for approximately 20 weeks.

## III. SUMMARY OF PROBABLE CAUSE

10. Between September and November 2017, a confidential informant ("CI") working for the ATF purchased firearms and ammunition from RODRIQUEZ, NICHOLSON, REYNOLDS, and RILEY. In total, the CI purchased five firearms and 104 rounds of ammunition over the course of three controlled buys, all of which were arranged by RODRIQUEZ and NICHOLSON. First, on September 7, 2017, the CI purchased a Norinco SKS rifle from NICHOLSON. Second, on September 19, 2017, the CI purchased a Remington Model 1100 shotgun and 104 rounds of ammunition from RODRIQUEZ, NICHOLSON, and REYNOLDS. Third, on November 6, 2017, the CI purchased a Glock 36 pistol and a Sig-Sauer P220 pistol from NICHOLSON and RILEY. The Norinco SKS rifle purchased on September 7, 2019, and the Remington Arms shotgun purchased on September 17, 2019, were both reported as stolen during a burglary on October 15, 2016. RODRIQUEZ, NICHOLSON, REYNOLDS, and RILEY are all convicted felons.

## IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports and video/audio recordings, conversations with other law enforcement agents, conversations with the CI, and my own knowledge of the investigation, I am aware of the following:

4

## A.   RODRIQUEZ Arranges Sale of Rifle to CI

12.  On September 5, 2017, a CI working with ATF informed SA Kyle Duncan that a mutual acquaintance had a contact named "Alfredo Pomares" with an AK-type rifle for sale for $700.[1]  The CI provided "Pomares"'s phone number as 850-356-3675.  The CI informed SA Duncan that the mutual acquaintance would forward the CI's number to "Pomares," who would call the CI later that day.  As described below, "Pomares" was later identified as RODRIQUEZ.

13.  At approximately 7:06pm on September 5, 2017, the CI received a phone call from RODRIQUEZ from phone number 850-356-3675.  During the call, RODRIQUEZ and the CI discussed the purchase of a firearm.  The CI asked RODRIQUEZ to hold "it" until Thursday (September 7, 2017), and RODRIQUEZ agreed.  He stated, "I'll hold it just for you, dawg."

## B.   As Arranged by RODRIQUEZ, NICHOLSON Sells Rifle to CI on September 7, 2017

14.  On September 7, 2017, at approximately 12:15pm, the CI placed a phone call to RODRIQUEZ and asked him to meet at a McDonald's in East Los Angeles.  RODRIQUEZ stated he could not meet because he was with his kids, but would have his "girl"

---

[1] The CI has pleaded guilty to charges of racketeer influence and corrupt organizations conspiracy (in violation of 18 U.S.C. § 1962(d)); conspiracy to traffic controlled substances (in violation of 21 U.S.C. §§ 846 and 841(a)(1),(b)(1)(A)); and unlawful possession of firearms or ammunition by a prohibited person (in violation of 18 U.S.C. § 922(g)).  The CI is cooperating with ATF for consideration in that case.  The information provided by the CI has been corroborated by agent surveillance and audio/video recordings. I believe the CI is reliable and credible.

5

bring it to the CI.  RODRIQUEZ stated he would call her and then call the CI back.

15.  At approximately 12:25pm, the CI received a call from a female from phone number 323-809-0621. The CI asked if she had time to meet at 2pm and they agreed to meet.  The female told the CI this was her number and asked that the CI call her when he/she was on the way.  The CI asked her what her name was and she stated, "Dominique."

    a.  Using law enforcement databases, I identified "Dominique" as NICHOLSON.  Specifically, I queried phone number 323-809-0621 in Accurint and found the name and address of NICHOLSON, whose first name is "Dominique."

16.  Through my review of the video recording of the controlled purchase, my debrief with the CI, and my debrief with law enforcement officers who conducted surveillance, I learned the following:

    a.  Around 2:30pm, the CI met NICHOLSON at a Home Depot parking lot across the street from the McDonald's. NICHOLSON stated "Fredo" was supposed to be there, but he was with his kids.

    b.  NICHOLSON was standing next to a Nissan Pathfinder driven by a man later identified as REYNOLDS.

    c.  The CI informed NICHOLSON that the CI was looking for any kind of straps (firearms) and since they were all going

to Mexico the CI didn't care if they were hot, burned, or clean (stolen, used, or new).[2]

      d.  NICHOLSON pulled an item wrapped in a towel out of her vehicle, handed it to the CI, who placed the item on the floor of the backseat of the CI's vehicle. As later determined by ATF, the item was a Norinco SKS rifle, 7.62x39mm caliber, bearing serial number 8802325, and a magazine. The CI paid NICHOLSON $760 for the firearm.

17. After the controlled buy, I showed a photograph of NICHOLSON to the CI, who identified NICHOLSON as the female who sold him the rifle. Moreover, I have viewed a video recording of the firearm sale and I believe the photograph of NICHOLSON matches the female who appears in the video recording of the firearm sale.

18. I queried the Norinco SKS rifle bearing serial number 8802325 in law enforcement databases and learned that the firearm was reported as stolen.

19. On December 19, 2018, an ATF Interstate Nexus Expert examined the Norinco SKS rifle bearing serial number 8802325 and confirmed that it was manufactured outside of the State of California. Because the firearm was found in California, I believe it traveled in and affected interstate commerce.

---

[2] I have translated certain words of coded language or street slang related to firearms dealing based on my training and experience. My translations appear as parentheticals following the translated word.

### C. NICHOLSON, RODRIQUEZ, and REYNOLDS Sell Shotgun to CI on September 21, 2017

20.  On September 19, 2017, NICHOLSON reached out to the CI via text messages on phone number 323-809-0621, the same telephone number used by NICHOLSON to arrange the September 7, 2017 firearm sale, and offered to sell a shotgun for $550 and "clips" (magazines) for $200.  At ATF's direction, the CI called NICHOLSON to discuss where to meet and they agreed to meet the following day.  On September 20, 2017, the CI and NICHOLSON rescheduled the deal for the next day.

21.  On September 21, 2017, the CI and NICHOLSON exchanged texts and phone calls to set up the time and location for the CI to purchase the shotgun.  NICHOLSON later texted the CI her address, which was "530 1/2 west 48th street."  She also stated that her cousin lives around the corner and "Fredo" was with her.

22.  Through my review of the video recording of the controlled purchase, my debrief with the CI, and my debrief with law enforcement officers who conducted surveillance, I learned the following:

a.  The CI called NICHOLSON at approximately 1:25pm to let her know that the CI was outside of the address provided. RODRIQUEZ met the CI at the driver's side window of the CI's car and informed the CI that "she," referring to NICHOLSON, was calling someone who lived right around the corner.

b.  The CI told RODRIQUEZ that the CI would purchase any kind of firearm because they were going to Tijuana, Mexico.

RODRIQUEZ stated, "If you able to, slide me a little, a little something, you know what I mean . . . for the hook-up." The CI stated, "Imma shoot you a twenty right now bro."

    c.   Later, NICHOLSON appeared at the driver's side window and the CI asked NICHOLSON where her "boy" was. NICHOLSON stated, "He had to get that shit out past his mama." She said he stays right there at Vernon and Raymond. She stated she didn't know where he kept them, but he kept popping up with them. She then said he was turning the corner at that moment.

    d.   A white Jeep bearing California license plate 6FXS803, registered to Dorothy Cordelia Reynolds at an address in Los Angeles, California, double-parked next to the CI's car. The driver of the Jeep was a black male in a white T-shirt, later identified as Darnel REYNOLDS.

    e.   REYNOLDS opened the back door of the CI's car and placed an item in the back passenger compartment of the CI's car. REYNOLDS carried a red case from the Jeep and sat down in the front passenger seat of the CI's car. REYNOLDS stated, "Everything in here is for either this one or the one I sold you earlier, right." The top of the case was visible as REYNOLDS opened it and continued, "It's a couple different things, I think one of 'em is bogus though, bro."

    f.   As later determined by ATF, a Remington Arms Company, model 1100 Magnum, 12-gauge caliber shotgun, serial number N711695M, was in the back passenger compartment of the CI's vehicle and the red case contained 104 rounds of assorted ammunition.

g.   The CI asked how much for all that and REYNOLDS replied that it was a hundred bucks extra for the two kinds of bullets and the two extra clips.   The CI paid REYNOLDS $670 for the firearm and ammunition.

23.   Using law enforcement databases, SA Duncan identified "Pomares" as Alfredo Pomdres (also spelled Pomares) RODRIQUEZ (also spelled "Rodriguez").   Specifically, SA Duncan queried the Calphoto image network database for "Alfredo Pomares."   I showed the CI a DMV photograph of RODRIQUEZ and the CI identified him as the "Alfredo" who was present at the September 21, 2017 firearm purchase.   Moreover, based on my review of the video recording of the transaction, I believe the photograph of RODRIQUEZ matches the male wearing red who appears in the video recording of the September 21, 2017 sale.

24.   Using law enforcement databases, I identified the driver of the white Jeep as Darnel Jay REYNOLDS.   Specifically, I queried the address on Dorothy Cordelia Reynolds's vehicle registration and, of the possible results, I found a match to the description of REYNOLDS.   I believe the photograph of REYNOLDS matches the male who appears in the video recording of the September 21, 2017 firearm sale.   In addition, I showed the CI a DMV photograph of REYNOLDS and the CI identified REYNOLDS as the one who sold the shotgun on September 21, 2017.   The CI also confirmed that REYNOLDS was the man who drove NICHOLSON when she sold the rifle to the CI on September 7, 2017.

25.   I queried the Remington Arms Company 1100 Magnum shotgun bearing serial number N711695M in law enforcement

databases and learned that the firearm was reported stolen.  I
learned from the Los Angeles Sheriff's Department ("LASD") that
both the Norinco SKS rifle sold on September 7, 2017, and the
Remington Arms Company 1100 Magnum shotgun sold on September 21,
2017, were stolen from the same location.

26.  On December 19, 2018, an ATF Interstate Nexus Expert
examined the firearms and ammunition sold in this transaction,
and confirmed that the firearms and ammunition were manufactured
outside of the State of California.  Because the firearms and
ammunition were found in California, I believe that they have
traveled in and affected interstate commerce.

### D.  NICHOLSON, RODRIQUEZ, and RILEY Sell Two Handguns and One AR-Type Rifle to CI on November 6, 2017

27.  On November 3, 2017, the CI notified ATF that
NICHOLSON texted him/her pictures of a revolver and semi-
automatic handgun for sale.  ATF directed the CI to get and
negotiate prices for the firearms and to set up the purchase for
Monday, November 6, 2017.

28.  During a recorded phone call at approximately 7:03pm
on November 3, 2017, the CI asked NICHOLSON how much she was
selling the guns for and NICHOLSON stated she had to ask
"Alfredo," which I understood to mean RODRIQUEZ.  RODRIQUEZ then
spoke to the CI on the phone in Spanish.  The CI asked if he/she
could get it on Monday and how much.  RODRIQUEZ said about $700
and the one with the extended clip would be about $800.

29.  On November 5, 2017, NICHOLSON texted pictures of an
AK-type rifle, an AR-type rifle, and a JA Nine pistol bearing

11

serial number 012693.  The CI and NICHOLSON exchanged several texts regarding prices.  At approximately 7:31pm, the CI spoke with RODRIQUEZ, who said that the "dude" just hit him up and had a "38, 9, 25," but got rid of the Draco yesterday with the drum. RODRIQUEZ discussed wanting to get rid of a package deal along with an AR 15 with two clips.  RODRIQUEZ stated the AR was about $1,200, but did not know for sure and would have to get the price on all the guns.

30.  On November 6, 2017, NICHOLSON called the CI and three-way dialed a man, later identified as RILEY.  During the call, RILEY stated the two 45's would be $1,750 and the AR would be $1,400.  They negotiated prices and agreed to $800 for each of the 45's and $1,400 for the AR.  NICHOLSON then sent the CI the following address: 6205 Harvard Blvd.

31.  Through my review of the video recording of the controlled purchase, my debrief with the CI, and my debrief with law enforcement officers who conducted surveillance, I learned the following:

a.  Around 1:45pm on November 6, 2017, the CI drove to 6205 Harvard Blvd, parked, and met with NICHOLSON and another man later identified as Willie RILEY.  At approximately 2:26pm, the CI counted out $1,600 in cash.  The CI said, "that's sixteen," and after counting it herself, NICHOLSON agreed.

b.  NICHOLSON opened the rear passenger door of the CI's car and placed a paper bag in the back seat.  As later determined by ATF, the brown paper bag contained one Sig-Sauer model P220 .45 caliber pistol, bearing serial number G245988,

and one Glock model 36 .45 caliber pistol, bearing serial FRA778, as well as five magazines.

      c.  At approximately 2:45pm, a white Crown Victoria pulled into the driveway and parked next to the CI's car.  RILEY opened the driver-side rear door of the Crown Victoria, took something from the backseat, and placed it in the backseat of the CI's car.  The CI counted out $1,400 in cash, handed the cash to RILEY, and asked RILEY to count it.

      d.  As later determined by ATF, the item placed in the backseat by RILEY was an AR-15-type rifle, bearing no serial number, and two magazines.

      e.  After the deal, RILEY got into a car with California license plate number 7TTR051.  Law enforcement queries on California license plate 7TTR051 showed the car was registered to RILEY.

    32.  After reviewing RILEY's DMV photograph, the CI confirmed that RILEY was the person who sold him the three firearms on November 6, 2017.  Based on my review of the video recording of the transaction, I believe the DMV photograph of RILEY matches the male who appears in the video recording of the November 6, 2017 firearm sale.  In addition, the CI confirmed that, based on hearing RILEY's voice and the context of the transaction, RILEY was the person on the earlier three-way telephone call arranged by NICHOLSON.

    **E.  Criminal History of RODRIQUEZ**

    33.  On September 11, 2019, I reviewed certified conviction documents for RODRIQUEZ and learned that RODRIQUEZ has

previously been convicted of the following felony crime
punishable by a term of imprisonment exceeding one year: On or
about May 3, 2007, a violation of California Health & Safety
Code Section 11350(a), Possession of a Controlled Substance, in
the Superior Court for the State of California, County of Los
Angeles, Case Number VA087290.

**F.   Criminal History of NICHOLSON**

34.   On September 11, 2019, I reviewed certified conviction
documents for NICHOLSON and learned that NICHOLSON has
previously been convicted of the following felony crime
punishable by a term of imprisonment exceeding one year: On or
about December 2, 2008, a violation of California Welfare &
Institutions Code Section 10980(c)(2), Aid by Misrepresentation
- Over $400, in the Superior Court for the State of California,
County of Los Angeles, Case Number BA338392.

**G.   Criminal History of REYNOLDS**

35.   On September 11, 2019, I reviewed certified conviction
documents for REYNOLDS and learned that REYNOLDS has previously
been convicted of the following felony crimes punishable by a
term of imprisonment exceeding one year:

a.   On or about April 17, 2007, a violation of
California Penal Code Section 459, First Degree Residential
Burglary, in the Superior Court for the State of California,
County of Los Angeles, Case Number LA053576;

b.   On or about April 17, 2007, a violation of
California Penal Code Section 496(a), Receiving Stolen Property,

14

in the Superior Court for the State of California, County of Los Angeles, Case Number LA053576; and

  c. On or about February 2, 2012, a violation of California Penal Code Section 459, Burglary, in the Superior Court for the State of California, County of Los Angeles, Case Number BA387581.

### H. Criminal History of RILEY

  36. On September 11, 2019, I reviewed certified conviction documents for RILEY and learned that RILEY has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

  a. On or about April 23, 1998, a violation of California Penal Code Section 211, Second Degree Robbery, in the Superior Court for the State of California, County of Los Angeles, Case Number TA049963;

  b. On or about June 24, 2003, a violation of California Penal Code Section 459, First Degree Burglary, in the Superior Court for the State of California, County of Los Angeles, Case Number SA048122; and

  c. On or about June 6, 2012, a violation of California Health & Safety Code Section 11351.5, Possession for Sale of Cocaine Base, in the Superior Court for the State of California, County of Los Angeles, Case Number BA392300.

### V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

  37. From my training, personal experience, and the collective experiences related to me by other law enforcement

officers who conduct who conduct firearms investigations, I am
aware of the following:

a. Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices. It has been my
experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals. Such information is also kept on digital devices
on their person and in backpacks or purses in their vicinity.

b. Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices. These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell
their firearms and purchase firearms. Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices. This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price. In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with

each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

38.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

19

which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

41. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RODRIQUEZ's, NICHOLSON's, REYNOLDS's, or RILEY's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of RODRIQUEZ's, NICHOLSON's, REYNOLDS's,

or RILEY's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

42. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **NON-ATTACHMENT OF AFFIDAVIT**

43. The affidavit has not been attached to the search warrant because allowing disclosure to RODRIQUEZ, NICHOLSON, REYNOLDS, or RILEY during the search would give them and other subjects of the investigation an opportunity to destroy evidence, threaten and/or intimidate the CI, change patterns of behavior, notify confederates, flee from prosecution, or otherwise seriously jeopardize the investigation. In addition, I am aware that "if the face sheet and attachments clearly state that the agents have lawful authority to conduct the search and specify the location to be searched and the items sought, the affidavit supporting the probable cause determination need not be served at the time of the search." United States v. Celestine, 324 F.3d 1095, 1100, 1101 (9th Cir. 2003).

## VIII.      CONCLUSION

44. For all of the reasons described above, there is probable cause to believe that Alfredo RODRIQUEZ and Dominique NICHOLSON have committed violations of 18 U.S.C. § 371: Conspiracy and 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms Without a License. In addition, for all of the reasons described above, there is also probable cause to believe that Darnel REYNOLDS and Willie RILEY have

committed violations of 18 U.S.C. § 922(g)(1): Felon in

Possession of a Firearm.   I also believe that there is probable

cause that the items to be seized described in Attachment B will

be found in a search of the persons described in Attachment A-1,

A-2, A-3 and A-4.


/s/

Tiffany Lamphere
Special Agent, ATF


Subscribed to and sworn before me
this 17th day of September, 2019.

UNITED STATES MAGISTRATE JUDGE